**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE**

**MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION NO.** |
| **v.** | ) | **2:19cr139-MHT** |
| | ) | **(WO)** |
| **DE'SEAN JAMAR POWELL** | ) | |

**OPINION**

The court found defendant De'Sean Jamar Powell guilty of the following count of a three-count petition to revoke his term of supervised release: he violated the condition that he shall not commit "another federal, state, or local crime," Revocation Petition (Doc. 81) at 1, in that he committed the state offense of "Domestic Violence, 2nd Degree, in violation of Alabama Criminal Code 13A-6-131," *id.*

The petition arose from an incident in which Powell shoved, punched, kicked, and choked his then-pregnant girlfriend. The victim recounted these facts to a police officer shortly after they occurred. Before the revocation hearing, however, she recanted her testimony. The government, at the court's urging,

still pursued the case, and when it called her to the stand during the revocation hearing, she continued to recant her original testimony. The court, however, did not credit her recantation, and, on the basis of her previous statements and other substantial and compelling evidence, still found Powell guilty of the domestic-violence offense.[1]

At sentencing, the court found that Powell's guideline range was 18 to 24 months. The court granted a variance, sentencing him to time served (95 days), and two years and 270 days of supervised release. The court also required him to receive trauma-informed therapy to address the reasons for his violence towards women, and forbade him from visiting the residences of

---

1. The government was able to proceed in this case by relying on the victim's earlier statements. While this was a revocation hearing, and the scope of admissible evidence therefore broader than it would have been in an ordinary criminal prosecution, the government's approach may be an option in other cases, too; according to the government attorney, officers often take non-testimonial statements from victims upon responding to incidents of domestic violence.

the victim and the two other women with whom he has recently fathered children.

The court writes now to offer some observations, both of this case and domestic-violence cases in general, concerning the relative utility of treatment and incarceration in preventing recidivism; victims' frequent aversion to the incarceration of their abusers; and the need to provide certain victims with immediate protection from abuse.

1. **The relative utility of treatment and incarceration in preventing recidivism**

The court's primary concern in this case was not limited to punishing Powell but also included "protecting women who may encounter [him], romantically or otherwise, in the future." *United States v. Henderson*, ___ F. Supp. 3d ___, ___, No. 2:19CR214-MHT, 2021 WL 2160544, at *1 (M.D. Ala. May 27, 2021) (Thompson, J.). The court found that requiring him to receive therapeutic counseling would better serve this goal than a mere sentence of incarceration.

3

Prior to sentencing, Powell was evaluated by Dr. Carla Stover of Yale University, a clinical psychologist who has worked in domestic-violence research for 20 years.  She determined that Powell has experienced nine of the 10 basic categories of adverse childhood experiences (ACEs), including the divorce of his parents, the incarceration of his father, consistent use of corporal punishment in his home, and severe bullying and violence in his school and neighborhood; as this court has previously found, "A person's risk of serious, long-term adverse effects becomes very high once the individual has experienced four of these 10 categories."  *United States v. Carter*, 506 F. Supp. 3d 1204, 1211 (M.D. Ala. 2020) (Thompson, J.).  From these experiences, Powell has developed post-traumatic stress disorder, or PTSD.  He has, according to Dr. Stover, a poor understanding of how to be in relationships, a strong fear of abandonment and not being loved, and significant difficulty understanding and managing his emotions.  He is also

4

highly reactive. These symptoms underlie Powell's proclivity for domestic violence. If Powell does not receive therapeutic treatment to address them, he has, according to Dr. Stover, a nearly 75 % chance of offending again within the next five years.

None of this makes the violence that Powell has visited on the victim here "less harmful or disturbing. There is [a] victim[] in this case." *Henderson*, ___ F. Supp. 3d at ___, 2021 WL 2160544, at *2. But, because Powell cannot access therapeutic treatment in prison sufficient to address his symptoms, the court determined that incarcerating him any longer would make him no less prone to violence. "Locking him up might provide a brief repose, but it would do nothing to affect his long-term risk of continuing to hurt women." *Id*. Instead, Powell "would sit in jail for a period of months and emerge no better prepared to manage his emotions and avoid becoming violent in his intimate relationships than he is now." *Id.* Moreover, as Dr. Stover explained, prolonged incarceration would not

5

only keep Powell from treatment, but would increase his stress, deprive him of human connection, and, in general, cause his mental health to deteriorate, increasing the likelihood of recidivism and "all but ensur[ing] further violence." *Id.*

What is true of Powell is, according to Dr. Stover's expertise and the court's experience, true of many other defendants in domestic-violence cases: therapeutic treatment is often more effective in reducing recidivism than mere incarceration. *See id.* Of course, sentences in domestic-violence cases should still vary according to the individual circumstances of each case. Different defendants commit domestic violence for different reasons. Some do so because they have a misogynistic desire to control women, or because they are indifferent to women's suffering. Others do so because, like Powell, they suffer from the residual effects of trauma and do not know how to control or express their emotions. The extent to which any given defendant's proclivity for violence can be

6

reduced by therapeutic treatment, and the nature of the appropriate treatment, will depend on his particular circumstances. So too will the case for retributive punishment. But there can be no doubt that in most cases, a sentence that focuses on treating the underlying causes of a defendant's violent tendencies and providing him with skills necessary to live in a healthy relationship will do more to protect victims, and society in general, than incarceration alone.

Equally important is that the treatment the defendant receives is substantial and informed, and tailored to him, and not merely limited to some brief attendance at a superficial program. "Tailoring the treatment to [Powell]'s specific abilities and needs gives the approach the court takes ... a much greater chance of success." *Id.*; *see also id*. ("[T]here now exist many different kinds of treatment approaches for perpetrators of domestic violence tailored to the various reasons why men use violence in relationships. A program directed at a root cause of violence that is

7

different from what motivates [the abuser]'s aggression would have little value for him."). Here, Dr. Stover examined Powell extensively and recommended a comprehensive and detailed regimen of treatment tailored to him. The court adopted this regimen in full.

First, the court required the following: Powell must "undergo individual therapy at least once per week to address his ... [PTSD]." Supplemental Order (Doc. 98) at 2. The therapist must "be skilled in evidence-based trauma therapy such as Cognitive Processing Therapy or Eye Movement Desensitization and Reprocessing Therapy, or another trauma-focused therapy." *Id.*

Second, the court required that Powell "undergo therapy that is trauma-informed and that will focus on building skills in the areas of emotion regulation, communication, and coping." *Id.* This therapy must "also focus on substance misuse and relapse prevention.

It may occur after the PTSD-focused therapy described above, and may be provided by the same therapist." *Id.*

Third, the court required that "Probation and the Federal Defender's Office shall assist ... Powell in locating a competent therapist to fulfill the ... conditions listed above." *Id.* at 3.

Fourth, the court required that Powell "undergo a group or psychoeducational class on healthy relationships and nonviolence, with a focus on responsible fatherhood," and that "[t]his condition ... not [necessarily] be completed immediately but ... within one year from the date of this order." *Id.* "The court recommend[ed] the Alabama Healthy Marriage and Relationship Program." *Id.*

And, finally, the court "recommend[ed] that [the victim] participate, as appropriate, in any counseling sessions involving ... Powell, except those relating to his PTSD." *Id.* at 4. The court made "this recommendation to facilitate [the victim]'s goal--as described in her testimony [at the revocation hearing],

9

and which the court shares--of ensuring that she and ... Powell build a healthy relationship and safe environment in which to raise their child." *Id.*[2]

2. Victims' frequent aversion to the incarceration of their abusers

Victims often do not wish for their abusers to be incarcerated, even if they might desire some form of

---

2. It should not be overlooked that the court also recommended "that, to the extent he is able to do so while still complying with the conditions listed above, ... Powell receive educational and vocational training and locate, with Probation's assistance, a mentor, vocational counselor or case manager to assist him." Supplemental Order (Doc. 98) at 3. "[D]eveloping financial stability and independence will help protect the women in [Powell's] life because ... '[f]inancial strain is a significant contributor to domestic violence incidents.'" *Henderson*, ___ F. Supp. 3d at ___, 2021 WL 2160544, at *2 (citation omitted).

The court also required that "Powell ... not consume alcohol" and that "Probation shall test ... Powell for alcohol use whenever it tests him for drug use," Supplemental Order (doc. 98) at 2, because, "based on the court's experience in past cases, substance use--in particular, alcohol use--facilitates violence, particularly domestic violence," *Henderson*, ___ F. Supp. 3d at ___, 2021 WL 2160544 at *2.

10


judicial intervention. The victim in this case appeared to be one. When the court explained to her at the revocation hearing, after she recanted her original statement, that it might order Powell to receive therapeutic treatment, she responded enthusiastically. Her refusal to cooperate with the government therefore seems to have arisen from her hesitancy to facilitate Powell's incarceration, and not from an aversion to the prosecution of the case in general.

As Dr. Stover explained, such hesitancy is understandable in this case. Powell is the father of the victim's child, and, despite his abusiveness, he and the victim remain close. When the abuser and the victim share children or the responsibilities of maintaining a home, or when the victim is financially dependent on the abuser, incarcerating the abuser can, in effect, punish the victim even while affording her a particular kind of respite. That alone is reason to incarcerate judiciously--to the extent that the court can minimize the victim's suffering, it should.

11

By refraining from reflexively incarcerating defendants for prolonged periods in domestic violence cases, the court can also expand the criminal legal system's capacity to address cases of domestic violence.  When, as Dr. Stover explained, victims who do not wish for their abusers to be incarcerated understand the only outcome of prosecution to be incarceration, they may refrain from reporting their abuse, or, as in this case, stop cooperating with the government even after bringing charges.  The court and the government might counter those tendencies by presenting *to the victim* substantial and detailed treatment as an alternative to incarceration, and thereby increase the number of domestic violence cases that are charged and successfully prosecuted.  The alternatives for the victim should not be incarceration of the abuser or nothing.

Here, throughout the prosecution the court tried to surmount the victim's essentially uninformed unwillingness to prosecute.  The court felt strongly,

after reading the revocation petition and allegations of abuse, that this case should be prosecuted if possible. Moreover, at the revocation hearing, the importance of prosecution became even more evident. Powell has recently fathered children with two other women, and remains in regular contact with at least one of them. Regardless of the desires of the victim in this pending case, those women too, and society at large, have an interest in ensuring that Powell's abuse stop and that he receive treatment. The court's point is simply that by embracing alternatives in addition to incarceration, it might encourage more victims to report their abuse and to cooperate with the government in stopping abuse against them and others. Had the victim in this case understood from the beginning that incarceration was not the only available outcome and that substantial and long-term treatment for Powell was a very likely outcome--such that, as she so wanted, she could be safe *and* there was a real possibility that her

family could be together in future--she might have made the government's task easier.

3. The need for immediate protection

While incarcerating domestic abusers may be counterproductive in the long run in some cases, in many cases there is also an immediate need to protect the victim from further abuse that can be met only by incapacitating the abuser. Sometimes that will require incarceration, particularly where the defendant is unlikely to abide by the terms of his supervised release. Here, the court determined that the need to incapacitate Powell could be met by imposing a "residential stay away," as opposed to a "no-contact," order, forbidding him from visiting the residences of the victim and the two other women with whom he has fathered children.[3] Supplemental Order (Doc. 98) at 1.

---

3. Powell does not live with the victim, and so the court's stay-away order did not risk disrupting Powell's treatment by depriving him of shelter. In cases where the abuser and the victim do live together, stay-away orders may or may not be appropriate.

14

This condition provides the victim and the other women with "a safe space" where they can return should Powell become abusive, while still allowing them to maintain contact with Powell, and to allow him to be present in the lives of his children, to the extent that they desire. The court further added flexibility by noting that it "may revisit this restriction [in] three months ..., upon ... Powell's motion or the recommendation of his probation officer, and after consultation with ... Powell's therapist, the government, probation, and defense counsel." *Id*. Importantly, this restriction was tied not only to Powell's conduct but his treatment.

Nevertheless, the court is aware that domestic abuse is widespread in this country; that, here, there has already been one victim who was seriously injured; and that, as observed above, the likelihood that Powell will re-abuse the current victim and abuse other women is high. The court therefore feels obligated to be vigilant about whether its measures for relief are

15

working.  The court believes it is critical that it be made quickly aware if these measures are not working and, if they are not, that it take swift action to revisit the adequacy of the treatment and whether there is a renewed need for incarceration.  Both Powell's supervising probation officer and his defense attorney are required to file with the court, every other month--at least, for the next few months--details as to whether all the measures the court has imposed are working.

****

Dr. Stover was careful to note that therapy as she described it to the court is not always successful.  However, her important point is that it often is.

DONE, this the 9th day of November, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE